Filed 12/12/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MILTON HOWARD GAINES, | B244961 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC361768) |
| v. | |
| FIDELITY NATIONAL TITLE INSURANCE COMPANY et al. | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Rolf M. Treu, Judge. Affirmed in part, reversed in part.

Ivie, McNeill & Wyatt, W. Keith Wyatt and Antonio K. Kizzie, for Plaintiff and Appellant.

Fidelity National Law Group and Kevin R. Broersma, for Defendants and Respondents Fidelity National Title Insurance Company and Bobbie Jo Rybicki.

Knapp, Petersen & Clarke and Steven Ray Garcia, for Defendants and Respondents Lehman Brothers Holdings, Inc. and Aurora Loan Services, LLC.

No appearance for Defendants and Respondents Joshua Tornberg, Craig Johnson, Ray Management Group, Inc., or A.J. Roop.

_____

In November 2006, Fannie Marie Gaines filed a complaint alleging causes of action for fraud and related claims arising out of the sale of her home.[1]  By May 2012, the action had not been brought to trial.  In August 2012, the trial court dismissed the suit for failure to bring the action to trial within five years, within the meaning of Code of Civil Procedure section 583.310, et seq.  On appeal, plaintiff contends the trial court erred in failing to exclude certain periods from the computation of the five-year deadline.  Plaintiff also asserts the trial court erred in dismissing the action as to all defendants, including ones who did not seek dismissal.  We find no error in the trial court's ruling dismissing the action as to the defendants named in the original complaint.  However, we conclude the trial court erred in dismissing the action as to one later-named defendant.  We therefore affirm in part, and reverse in part.

### FACTUAL AND PROCEDURAL BACKGROUND

*Facts Underlying the Complaint*

According to plaintiff's complaint, Milton and Fannie Marie Gaines owned a property in Los Angeles (the Property) that, prior to February 2006, was encumbered by a first deed of trust loan of $554,000.  The loan was held by Countrywide Home Loans, Inc. (Countrywide).  The complaint alleged the Gaineses had over $500,000 in equity in the Property.  By February 2006, they had fallen two months behind in payments on the Countrywide loan.  They received a notice of default and acceleration from Countrywide warning of foreclosure proceedings if they did not cure the default.  The Gaineses began investigating refinancing the Countrywide loan.

In March 2006, A.J. Roop contacted the Gaineses.  Roop identified herself as a Countrywide employee and informed the Gaineses that they had been preapproved for a refinance loan.  In April 2006, the Gaineses again became delinquent in their loan payments.  They received a second notice of default and acceleration.  As of June 2006,

---

[1]   Fannie Marie Gaines passed away in November 2009.  Her son, Milton Howard Gaines was substituted in as her successor in interest.  Although Milton Howard Gaines thus became the "plaintiff" during the pendency of the litigation, for simplicity and ease of reading we will refer to Fannie Marie Gaines as plaintiff throughout.

the Property was appraised at $1 million. In June or July 2006, Roop told the Gaineses Countrywide had not approved their loan refinance application. Roop subsequently contacted the Gaineses and suggested her fiancé, Joshua Tornberg, could assist them in obtaining a refinance loan. Roop said Tornberg worked with Craig Johnson and Ray Management to assist people who had difficulty obtaining financing. Roop had given Tornberg and Johnson the Gaineses' loan application and contact information.

In June or July 2006, Tornberg, Johnson, and Ray Management (collectively the Tornberg defendants) contacted the Gaineses and offered to help them find a refinance loan. Another appraisal valued the property at $1.25 million. According to the complaint, the Tornberg defendants told the Gaineses not to seek refinancing from any other lenders. In early July 2006, foreclosure proceedings were initiated. The Gaineses were $16,625.34 in arrears. The balance on the Countrywide loan was $554,000. In mid-July 2006, the Tornberg defendants informed the Gaineses they were unable to obtain a refinance loan. The Tornberg defendants proposed that they would purchase the Property for $950,000, including $100,000 to be used for repairs they would oversee. The Tornberg defendants also promised to lease the Property back to the Gaineses. They represented the lease would give the Gaineses an option to re-purchase the Property.

The Gaineses agreed to sell the Property to the Tornberg defendants. An escrow was opened at Fidelity to complete the transaction. In early August 2006, the Gaineses executed a warranty deed to transfer title of the Property to Tornberg. The complaint alleged, however, that the deed recorded was an altered warranty deed, recorded without the Gaineses' permission. The complaint also alleged Fidelity National Title Insurance Company (Fidelity), and its employee, Bobbie Jo Rybicki (collectively the Fidelity defendants), improperly released $90,000 to the Tornberg defendants from the escrow account. Further, according to the complaint, after the close of escrow, the Tornberg defendants presented the Gaineses with a revised month-to-month lease that did not include a purchase option. Milton Gaines died in late August 2006.

3

To purchase the Property, Tornberg took out an $855,000 loan secured by the Property. Tornberg subsequently refinanced the loan with a new $865,000 loan (the Tornberg loan), and procured an additional $150,000 loan secured by a deed of trust encumbering the Property. By June 2007, Tornberg owed $25,000 in delinquent payments for at least one of the loans secured by the Property. Fannie Marie Gaines paid the delinquent amount to avoid foreclosure proceedings. After multiple transfers between various entities, the Tornberg loan was eventually held or serviced by Aurora Loan Services, LLC (Aurora) and Lehman Brothers Holdings, Inc. (Lehman).

*Procedural Background*

On November 13, 2006, Fannie Marie Gaines filed a complaint against the Tornberg defendants, Roop, Countrywide, and the Fidelity defendants. The complaint also included fictitiously named Doe defendants 1 to 30. Plaintiff asserted claims for fraud, violation of Civil Code home equity sales contract requirements, intentional infliction of emotional distress, and negligence. The complaint sought rescission and cancellation of the deed transferring title of the Property to Tornberg. In January 2008, plaintiff filed a fourth amended complaint naming Aurora as a defendant, and Doe defendants 31 to 50.[2] In March 2008, the parties agreed to participate in mediation. In early April 2008, plaintiff's counsel filed an ex parte application for an order striking the existing September 2008 trial date and related dates, staying the action for 120 days except for responses to outstanding discovery requests, and directing the parties to participate in good faith in a mediation within the next 90 days. The trial court granted the application and set a post-mediation and trial setting conference for July 2008.

---

[2] A series of amended complaints named other defendants: Greenpoint Mortgage Funding, Inc., United Mortgage Loan & Investment, LLC and UM Acquisitions, LLC. In 2008, plaintiff informed the court that Greenpoint Mortgage Funding, Inc. no longer held an interest in the Tornberg Loan. Plaintiff reached settlements with Countrywide, United Mortgage Loan & Investment, LLC, and UM Acquisitions, LLC. By August 2010, only the Fidelity defendants, Aurora, and Lehman were active participants. On our own motion we have augmented the record to include the Third and Fourth Amended Complaints.

The mediation was unsuccessful. The case was reassigned to a new judge. At a November 2008 status conference, the court terminated the stay of the proceedings. The court scheduled a trial setting conference for December 2008, and subsequently set an August 2009 trial date. Around that time, Aurora began indicating it did not hold legal title to the Property or have legal rights with respect to the Tornberg Loan. The trial date was vacated as a result. In early November 2009, Aurora sought leave to file an amended verified answer. In a declaration accompanying the motion for leave, Aurora's counsel declared he learned in May 2009 that Lehman owned the Tornberg Loan, and that Aurora did not have any title to the deed of trust securing the loan. Aurora's counsel further declared he promptly provided this information to plaintiff's counsel. Aurora's counsel also reported that, at plaintiff's counsel's request, he had eventually secured a declaration from a Lehman Vice President, attesting to the ownership of the Tornberg Loan. In the amended answer, Aurora denied having an interest in the Property or the Tornberg Loan. Lehman had declared bankruptcy in 2008.

On November 29, 2009, Fannie Marie Gaines passed away. Plaintiff had scheduled a motion for leave to file a fifth amended complaint to be heard on December 18, 2009; plaintiff's counsel sought to file an ex parte application on that date to substitute a successor in interest as the plaintiff in the action. The hearing on the motion and application was continued to January 28, 2010, the then-scheduled trial date. On January 28, the court granted plaintiff's motion for leave to file a fifth amended complaint, and granted the application substituting Gaines's son as the successor in interest and plaintiff in the action. The court set a new trial date of August 30, 2010. The fifth amended complaint did not name Lehman as a defendant.

In mid-August 2010, Aurora filed an answer to the fifth amended complaint in which it again denied owning the promissory note at issue, or possessing any rights as a beneficiary of the deed of trust securing the Tornberg Loan against the Property. Aurora alleged, on information and belief, that Lehman had rights in the loan, and was in bankruptcy.

5

At a subsequent August 2010 status conference, Aurora's counsel informed the court that Lehman was still in bankruptcy. Plaintiff's counsel suggested that the court continue the matter to allow plaintiff time to "bifurcate" as to Lehman and proceed against the other defendants. The court suggested it would not "look with a great deal of favor on bifurcating things," but also stated: "I'm not saying I'm going to deny your motion, I'm just sending up the yellow flag." The court continued the matter to November 2010.

At the November 2010 status conference, plaintiff's counsel informed the court they were ready to set the matter for trial. Aurora's counsel informed the court that Lehman was still in bankruptcy and plaintiff had not sought relief from the bankruptcy stay. Bankruptcy proceedings were taking place in the United States Bankruptcy Court for the Southern District of New York. Aurora's counsel suggested that without having Lehman as a party, the case would have to be tried twice. The court said it would not do that and asked why plaintiff had not named Lehman as a defendant. Plaintiff's counsel indicated plaintiff did not have proof that Lehman was a titleholder, and a declaration was not sufficient proof of interest in the Property. The court expressed frustration with the parties for the lack of progress on the Lehman issue. It suggested the parties come up with a solution, and set a status conference for mid-December 2010.

At the December status conference, Aurora indicated an assignment document would be recorded the next day, documenting Lehman's ownership interest in the Tornberg Loan. Plaintiff's counsel reported plaintiff's next step would be to seek relief from the bankruptcy stay. At the next status conference in February 2011, plaintiff's counsel indicated he had authorization to retain New York counsel to file a petition for relief from the bankruptcy. The court continued the matter to June 20, 2011. In October 25, 2011, the bankruptcy court entered a stipulation, agreement, and order, lifting the bankruptcy stay as to plaintiff's claims.

On November 15, 2011, plaintiff amended her complaint to add Lehman to the action as previously-named Doe 31. Lehman answered the complaint in December 2011. Trial was set for August 6, 2012. Lehman sought leave to file a cross-complaint seeking

a declaratory judgment validating its deed of trust "or impressing and enforcing an equitable lien against the subject property."

In May 2012, the Fidelity defendants moved to dismiss plaintiff's complaint under Code of Civil Procedure sections 583.310 and 583.360.[3]  The Fidelity defendants argued neither the bankruptcy stay nor Fannie Marie Gaines's death tolled the five-year period so as to extend it beyond November 2011.

In opposition to the motion, plaintiff argued the action was stayed for seven months and three days in 2008 when the court granted the parties' application for a 120-day stay in April 2008, and the court did not lift the stay until November 2008.  Plaintiff further argued the two-month period between Fannie Marie Gaines's death and the substitution of a successor should be excluded from the five-year period.  Plaintiff additionally contended the five-year period was tolled for the period in which plaintiff sought relief from the bankruptcy stay between June and October 2011, because it was impossible, impracticable, or futile to bring the action to trial while the bankruptcy stay was in effect as to Lehman.  Plaintiff's counsel declared it took six months to secure New York counsel.[4]  Plaintiff's counsel declared plaintiff had paid significant sums to stop foreclosure sales on the property, and there had been "extensive litigation" of the matter.  Plaintiff noted the possibility of severing defendants from the action was not determinative, and the court had indicated it would not sever the action to allow trial to proceed against the Fidelity defendants first.

---

[3]     All further statutory references are to the Code of Civil Procedure unless otherwise noted.

[4]     Counsel's declaration suggested securing local counsel was made more difficult since, "[b]ecause of financial considerations, [counsel] attempted to obtain a firm which would not require substantial fees to be paid as an initial retainer."

7

In reply, the Fidelity defendants argued the 2008 mediation stay did not qualify as a stay under section 583.340, subdivision (b). They also asserted the time it took for plaintiff to secure relief from the bankruptcy stay and add Lehman as a defendant should not be excluded from the five-year period.

In a tentative ruling, the court indicated it would grant the motion to dismiss.[5] The trial court agreed with plaintiff's assessment that two months should be excluded from the five-year period due to Fannie Marie Gaines's death and the need to substitute a successor in interest as plaintiff. The court also accepted plaintiff's argument regarding the Lehman bankruptcy and excluded a 125-day period from the time plaintiff secured bankruptcy counsel, to the time she secured relief from the bankruptcy stay. However, the court determined the stay of the action between April 2008 and November 2008 was a partial stay and not a stay within the meaning of section 583.340, subdivision (b). The court further determined plaintiff had not demonstrated she was diligent in prosecuting the action during the stay, or that the stay made it impossible, impractical, or futile to bring the action to trial. With the permitted exclusions, the court concluded plaintiff should have commenced trial by May 16, 2012, to fall within the five-year period. The scheduled trial date exceeded the adjusted 5-year-period by 82 days. The tentative order indicated Lehman's motion for leave to file a cross-complaint was moot.

At the hearing on the motion, plaintiff contended that even if the court dismissed the action, it should be dismissed only as to the Fidelity defendants because they were the only parties who moved for dismissal. Plaintiff's counsel argued the failure to move for dismissal constituted a waiver of rights under the dismissal statute. Counsel further asserted plaintiff had been diligent in prosecuting the action, the 2008 stay was negotiated among all parties, and defendants were estopped from arguing the 2008 stay should be included in the five-year period. Although they had not filed or joined a motion to

---

[5]    The record includes a copy of the tentative order. It appears the order was printed the day before the hearing.

8

dismiss, counsel for Lehman and Aurora argued at the hearing. All defendants present at the hearing argued the five-year dismissal requirement was "jurisdictional" such that if the court granted the Fidelity defendants' motion, it would have no jurisdiction to hear the case against Lehman alone. On August 1, 2012, the court adopted its tentative as the final order.

On August 20, 2012, plaintiff filed a motion for reconsideration. Plaintiff asserted the trial court failed to take into account various factors concerning the 2008 stay, such as that it was agreed upon by all parties, and applied to all parties. Plaintiff asserted that because the Fidelity defendants did not explicitly argue the 2008 stay did not toll the five-year period until their reply on the motion to dismiss, she was unable to effectively present arguments on the issue. Further, plaintiff contended she had not been provided notice that the non-moving defendants would be included in the motion and she was therefore unable to offer evidence specific to those defendants. Plaintiff argued the court failed to consider that the five-year period had not expired as to Lehman.

On August 24, 2012, the trial court entered a judgment of dismissal. On September 6, 2012, Aurora and Lehman served a notice of entry of judgment. On October 22, 2012, the trial court denied the motion for reconsideration. Plaintiff filed a notice of appeal on November 5, 2012.

## DISCUSSION

### I. The Trial Court Did Not Err in Dismissing the Action as to the Fidelity Defendants

#### A. Applicable Legal Principles

Under section 583.310, "[a]n action shall be brought to trial within five years after the action is commenced against the defendant." Under section 583.340, "[i]n computing the time within which an action must be brought to trial. . . there shall be excluded the time during which any of the following conditions existed: (a) The jurisdiction of the court to try the action was suspended. (b) Prosecution or trial of the action was stayed or enjoined. (c) Bringing the action to trial, for any reason, was impossible, impracticable, or futile."

9

If the action is not brought to trial within the time prescribed in the statute it "shall be dismissed by the court on its own motion or on motion of the defendant, after notice to the parties." (§ 583.360, subd. (a).) Section 583.360, subdivision (b) provides: "The requirements of this article are mandatory and are not subject to extension, excuse, or exception except as expressly provided by statute."

To the extent a trial court ruling under section 583.340 is based on an interpretation of the statute, we review the ruling de novo. However, the trial court has discretion to determine whether the section 583.340, subdivision (c) exception applies. We will uphold the ruling unless the plaintiff establishes the trial court abused its discretion. (*Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724, 731 (*Bruns*).)

**B. The Trial Court Did Not Err in Refusing to Exclude the 2008 Stay From the Five-Year Period Under Section 583.340, subdivision (b)**

Plaintiff filed her original complaint in November 2006. The trial court dismissed the case in August 2012. In calculating the five-year deadline, the trial court excluded a total of 185 days as periods in which it was impossible or impracticable to bring the action to trial. Even with those exclusions, the five-year period expired in May 2012. Plaintiff contends the trial court should have excluded either 120 or 217 additional days from the five-year period because the case was stayed in 2008 within the meaning of section 583.340, subdivision (b), which excludes from the five-year period any time in which "prosecution or trial of the action was stayed or enjoined." We find *Bruns* controlling on this issue and reject plaintiff's argument.

In *Bruns,* the California Supreme Court considered whether section 583.340, subdivision (b) applies when a stay encompasses only some of an action's proceedings, or "partial stays." After reviewing the language of the statute and the legislative history, the court concluded only *complete* stays fall under section 583.340, subdivision (b). The court explained: "When the statute is read as a whole, it becomes apparent that subdivision (b) contemplates a bright-line, nondiscretionary rule that excludes from the time in which a plaintiff must bring a case to trial only that time during which all the

10

proceedings in an action are stayed . . . . Obviously, if a complete stay is in effect, bringing the action to trial is impossible. It makes sense for the Legislature to state a bright-line rule in this situation. The effect of a partial stay, however, can vary from stay to stay and from case to case. A partial stay might, or might not, make it 'impossible, impracticable, or futile' to bring the action to trial." (*Bruns, supra,* 51 Cal.4th at p. 726.) The court thus concluded section 583.340, subdivision (b) "governs only complete stays that are 'used to stop the prosecution of the action altogether.' [Citation.]" (*Id.* at p. 730.)

In this case, the trial court entered a stay in April 2008, at the request of the parties. The court's order took existing trial and hearing dates off calendar, but required the parties to respond to all previously served and outstanding written discovery. Thus some "prosecution" of the action was continuing, even during the stay. Applying the reasoning of *Bruns*, the 2008 stay did not fall within section 583.340, subdivision (b).

On appeal, plaintiff argues the parties contemplated a complete stay because they agreed to stay everything except responses to outstanding written discovery, and no new discovery was to be served. Plaintiff further asserts defendants have not identified any written discovery responses exchanged during the stay which would support a conclusion that litigation actually continued. These arguments miss the point. As *Bruns* clarified, a section 583.340, subdivision (b) stay is one that stays *all* prosecution of the action. The 2008 stay in this case allowed for some discovery to proceed, and was therefore not a complete stay. Whether any party actually served discovery responses during the 2008 stay does not recharacterize the trial court order, which allowed for some discovery to take place during the stay.

**C. Defendants Are Not Estopped From Asserting the 2008 Stay Did Not Extend the Five-Year Period**

Plaintiff further contends that because defendants agreed to the 2008 stay, they are equitably estopped from arguing the stay did not toll the action within the meaning of section 583.340, subdivision (b), or otherwise extend the five-year period. We disagree.

11

"Equitable estoppel can be found only when (1) the party to be estopped was aware of the true facts; (2) that party either intended that its act or omission be acted upon, or so acted that the party asserting estoppel has a right to believe it was intended; (3) the party asserting estoppel was unaware of the true facts; and (4) the party asserting estoppel relied on the other party's conduct to its detriment." (*Jordan v. Superstar Sandcars* (2010) 182 Cal.App.4th 1416, 1422-1423 (*Jordan*).)

Nothing in the record before us demonstrates or even suggests the parties intended the stay would extend the five-year period under section 583.310. The trial court properly rejected any argument that the parties' agreement, entered into less than two years after the filing of the original complaint, and which did not mention the five-year dismissal statute, could reasonably have lulled plaintiff into believing defendants would agree the 2008 stay tolled the five-year period. This case is not like *Tresway Aero, Inc. v. Superior Court* (1971) 5 Cal.3d 431 (*Tresway*), upon which plaintiff relies. In *Tresway*, the plaintiff's service of a summons was invalid, but after receiving the summons and complaint, the defendant's attorney requested a 20-day extension to file an answer. However, instead of filing an answer, the defendant moved to quash service of summons. The defendant also sought dismissal for failure to serve a summons within three years of the filing of the complaint, only days after the statutory period expired. (*Id.* at p. 434.) The court concluded the defendant was estopped from arguing the dismissal statute applied. The court found the defendant's request for an extension to file an answer lulled the plaintiff into a false sense of security that the defendant would answer instead of challenging service of process. This further prevented the plaintiff from discovering the problems with service of process, and from effecting valid service within the statutory period. (*Id.* at pp. 441-442.) Plaintiff identifies no analogous conduct on the part of the defendants in this case. The reasoning of *Tresway* does not apply here.

*Woley v. Turkus* (1958) 51 Cal.2d 402 (*Woley*), is similarly unhelpful to plaintiff. In *Woley*, the parties entered a written stipulation which, at the defendant's request, continued a plaintiff's motion for summary judgment and trial beyond the five-year statutory period under then section 583. (*Id.* at p. 405.) In the stipulation, the parties

12

expressly acknowledged the five-year deadline. (*Ibid.*) The defendant subsequently moved to dismiss the action based on the plaintiff's failure to bring the case to trial within five years. The court found the defendant's request to have the trial continued beyond the five-year period estopped it from subsequently seeking dismissal for failure to prosecute.

In contrast, here, neither the parties' agreement as set forth in the correspondence exchanged by counsel, nor the order prepared for the court, mentioned the five-year period. Nothing included in the record identified the parties' agreement as one for a stay for all purposes. There is no language in any of the relevant documents from which it could be inferred defendants caused plaintiff to believe the 2008 stay would necessarily be excluded from any calculation of the five-year period. (*Knight v. Pacific Gas & Elec. Co.* (1960) 178 Cal.App.2d 923, 926-927, 930-931 [absent language regarding five-year period, stipulations continuing litigation dates did not estop defendant from seeking dismissal for delay].) The evidence supports the trial court's rejection of plaintiff's equitable estoppel argument. (*Jordan, supra,* 182 Cal.App.4th at pp. 1422-1423.)

**D. The Trial Court Did Not Abuse its Discretion in Concluding the Partial Stay Did Not Make it Impossible, Impractical, or Futile for Plaintiff to Bring the Action to Trial**

Plaintiff argues that even if the 2008 stay was not automatically excludable under section 583.340, subdivision (b), the 120-day stay rendered it impossible, impracticable, or futile for plaintiff to bring the action to trial within five years. We find no abuse of discretion in the trial court's rejection of this argument. (*Bruns, supra,* 51 Cal.4th at p. 731.)

"Under 583.340(c), the trial court must determine what is impossible, impracticable, or futile 'in light of all the circumstances in the individual case, including the acts and conduct of the parties and the nature of the proceedings themselves. [Citations.] The critical factor in applying these exceptions to a given factual situation is whether the plaintiff exercised reasonable diligence in prosecuting his or her case.' [Citations.] . . . . Determining whether the subdivision (c) exception applies requires a fact-sensitive inquiry and depends 'on the obstacles faced by the plaintiff in prosecuting

13

the action and the plaintiff's exercise of reasonable diligence in overcoming those obstacles.' [Citation.]   ' "[I]mpracticability and futility" involve a determination of " '*excessive* and *unreasonable* difficulty or expense,' " in light of all the circumstances of the particular case.' [Citation.]" (*Bruns, supra,* 51 Cal.4th at p. 731.)

The subdivision (c) exception "is recognized because the purpose of the five-year statute is to prevent *avoidable* delay, and the exception makes allowance for circumstances beyond the plaintiff's control, in which moving the case to trial is impracticable for all practical purposes." (*De Santiago v. D & G Plumbing, Inc.* (2007) 155 Cal.App.4th 365, 371 (*De Santiago*).)

The question of impracticability and reasonable diligence was not limited to plaintiff's actions during the 2008 stay.  Instead, the trial court was to consider whether, in light of all of the circumstances of the case, the 2008 stay rendered it impossible, impracticable, or futile for plaintiff to bring the case to trial within five years.[6]  (*Sanchez v. City of Los Angeles* (2003) 109 Cal.App.4th 1262, 1270 (*Sanchez*).)  The court could reasonably conclude the stay had no such effect.  In *Tamburina v. Combined Ins. Co. of America* (2007) 147 Cal.App.4th 323 (*Tamburina*), the court explained a "circumstance of impracticability will not toll the statutory five-year deadline unless the plaintiff shows a 'causal connection' between the circumstance and moving the case to trial." (*Id.* at p. 333.)  The trial court here could reasonably conclude plaintiff did not establish a causal connection between the 2008 stay and her failure to satisfy the five-year requirement.  Some discovery was permitted during the stay, and there is no indication plaintiff was ready for trial at the time of the stay. (*Jordan, supra,* 182 Cal.App.4th at p. 1421.)  Further, the 2008 stay was for a relatively short period, several years before the five-year

---

[6]     Some courts have reasoned the trial court must find three factors to determine whether the impracticability exception applies: "(1) a circumstance of impracticability; (2) a causal connection between that circumstance and the plaintiff's failure to move the case to trial; and (3) that the plaintiff was reasonably diligent in moving the case to trial. [Citation.]  The plaintiff has the burden of proving these factors." (*De Santiago, supra,* 155 Cal.App.4th at p. 372, citing *Tamburina, supra,* 147 Cal.App.4th at p. 328; see also *Bruns, supra,* 51 Cal.4th at p. 731.)

deadline expired. Plaintiff did not establish the stay deprived her of a substantial portion of the five-year period, or that the stay was directly related to her failure to reach trial within five years. (*Tamburina, supra,* 147 Cal.App.4th at p. 335; *Sanchez, supra,* 109 Cal.App.4th at p. 1272 [exception inapplicable where inadequate oversight, rather than death of defense counsel, was the reason plaintiffs missed the five-year deadline].)

Moreover, even if plaintiff had satisfied the causal connection requirement, the trial court justifiably concluded she failed to demonstrate she was reasonably diligent in prosecuting the case. Reasonable diligence is required at all stages of the proceedings. (*Tamburina, supra,* 147 Cal.App.4th at p. 336; *Sanchez*, *supra,* 109 Cal.App.4th at p. 1270.) " ' "The 'reasonable diligence' standard is an appropriate guideline for evaluating whether it was impossible, impracticable, or futile for the plaintiff to comply with [the statutory five-year constraint] *due to causes beyond his or her control*." ' [Citation.]" (*Bruns, supra,* 51 Cal.4th at p. 731, italics in original.)

In this case, even in plaintiff's own timeline, there are multiple lengthy periods for which plaintiff has proffered no argument or evidence to show she was diligently prosecuting the case during that time.

For example, although plaintiff filed her original complaint in November 2006, the next date on her timeline relating to litigation is March 2008, when Plaintiff's counsel initiated discussions with defendants regarding a stay.**7** Plaintiff did not establish diligent

---

**7** The only intermediate date listed on plaintiff's timeline is a June 2007 payment Gaines made to prevent foreclosure proceedings. While this demonstrated plaintiff continued to have an interest in the Property, this date does not address plaintiff's efforts to advance the litigation. Similarly, plaintiff lists dates in June 2008 and August 2009, when she reached settlements with various parties. Although plaintiff's attempts to settle her claims against various defendants show she was engaged with the dispute, they are not evidence she was acting diligently to bring non-settling parties to trial within five years. Following the 2008 mediation, there is no mention of any further attempts at a global settlement. Thus, plaintiff still had a responsibility to continue prosecuting the case against those defendants not amenable to settlement. (See *Berger v. McMahan* (1953) 116 Cal.App.2d 328, 331 ["Negotiations for settlement do not except an action from the mandatory provisions of the statute."].) Further, plaintiff has not argued that, aside from the 2008 mediation, her settlement efforts rendered it impossible,

15

prosecution during this 16-month period. In April 2008, the court granted the partial stay of the proceedings to allow for mediation, but the stay arguably terminated on its own after 120 days, in July 2008. Even if this was unclear, plaintiff did not seek to lift the stay, thereby leaving it in place for an additional four months until November 2008. The record further contains no information about plaintiff's efforts to prosecute the case during the approximately six-month period between November 2008 and May 2009. (*De Santiago, supra,* 155 Cal.App.4th at pp. 375-376 [diligence after alleged period of impracticability is a critical factor in determining application of the exception].)

In addition, after Aurora first indicated in May 2009 that it had no interest in the Property or the Tornberg loan, and identified Lehman as a relevant party, plaintiff did not hire counsel to seek relief from the bankruptcy stay until June 2011, over two years later. Plaintiff asserts that once Aurora disclaimed an interest in the Tornberg Loan, it was reasonable for her to demand proof that this was the case, and reasonable for her to wait until she had received such proof before she took action to pursue Lehman as a defendant. Yet, the court could reasonably conclude plaintiff did not establish she exercised reasonable diligence in overcoming these obstacles. Plaintiff did not indicate, for example, that plaintiff's counsel served any discovery on Aurora to attempt to determine whether Aurora's claims were true, or whether Lehman in fact had an ownership interest in the Tornberg loan. Instead, the only information in the record on this issue suggests that plaintiff "asked" Aurora for proof of its lack of ownership interest, and Lehman's interest, but did not receive it until December 2010. Thus, approximately *16 months* passed from the time Aurora first indicated it did not own the

---

impracticable, or futile to bring the action to trial against non-settling defendants within the five-year period, or that the non-settling defendants ever led her to believe, after 2008, that they would settle the case, making it unnecessary to move the case to trial. Indeed, the record is almost entirely devoid of information establishing plaintiff was actively engaged in the traditional hallmarks of pre-trial litigation, such as written discovery, depositions, or motion practice. We therefore disagree with the dissent's assertion that the record shows the case was "extensively litigated."

16

Tornberg loan until plaintiff felt she had sufficient proof to proceed against Lehman. Plaintiff simply did not establish that she was reasonably diligent in this period.

Even after receiving proof that Lehman owned the Tornberg loan, there were substantial indications that plaintiff was not reasonably diligent. She did not secure New York counsel to seek relief from the bankruptcy for six months. (*Tamburina, supra,* 147 Cal.App.4th at p. 336 [level of diligence required increases as the five-year deadline approaches].) After receiving relief from the stay, plaintiff waited another two weeks before amending her complaint to add Lehman. She had already acquiesced in the setting of a trial date past the nominal five-year deadline. (*Jordan, supra,* 182 Cal.App.4th at p. 1422.)

The dissent contends the trial court abused its discretion because it did not exclude from the five-year calculation any of the delays caused by Aurora's mistaken admission that it had an ownership interest in the Tornberg loan or the Property. However, plaintiff never asked the trial court to exclude these periods. The dissent identifies an 11-month period of "wasted time" between Aurora's January 2009 answer, and the November 2009 amended answer in which it denied having an interest in the Tornberg loan or the Property. Yet, in opposing the motion to dismiss, plaintiff never identified this period to the trial court as one that should be excluded from the five-year calculation. Nor does plaintiff contend on appeal that the trial court should have excluded this 11-month period.

Similarly, as the trial court noted in its ruling, plaintiff did not argue the court should exclude from the five-year calculation the entire period during which Lehman had been identified but was not yet named as a defendant, or the entire period of Lehman's bankruptcy. Instead, plaintiff contended the court should exclude only the limited period between June and October 2011, after she had retained bankruptcy counsel and actively sought relief from the bankruptcy stay. The court agreed and excluded this limited period. Even on appeal, plaintiff does not contend the trial court should have excluded more time from the five-year calculation based on the Aurora/Lehman confusion. Plaintiff's arguments consistently have been limited to the trial court's failure to exclude

the 2008 stay from the five-year period. Her assertions regarding the Aurora/Lehman delays concerned only the question of her diligence in prosecuting the action.

We decline to find the trial court abused its discretion in failing to rule based on legal theories plaintiff did not advance below, or in this court. (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545-546.)

In sum, it was plaintiff's burden to prove the circumstances warranted application of the section 583.340, subdivision (c) exception. (*Tamburina, supra,* 147 Cal.App.4th at p. 329.) Plaintiff did not establish a causal connection between the 2008 stay and her failure to meet the five-year deadline. Further, the trial court could reasonably conclude she did not exercise reasonable diligence at all stages of the proceeding. We find no abuse of discretion in the court's determination that the 2008 stay was not excludable under section 583.340, subdivision (c) as a circumstance making it impossible, impracticable, or futile for plaintiff to bring the action to trial within five years. (*Hughes v. Kimble* (1992) 5 Cal.App.4th 59, 67 [exception does not apply where plaintiff has not exercised reasonable diligence in pursuing the cause of action].)

## II.     The Non-Moving Defendants

Plaintiff asserts the trial court erred in dismissing the action as to all defendants because only the Fidelity defendants filed a motion for dismissal. Plaintiff argues the non-moving defendants waived their rights by not joining the Fidelity defendants' motion. Plaintiff also contends the five-year period had not expired as to Lehman, thus the court could not dismiss the action against it. Defendants argue the five-year period begins when the plaintiff files the original complaint and the period is not specific to each defendant. We address these issues below.

### A.  Dismissal as to One Defendant Does Not Necessarily Require Dismissal as to All

We disagree with defendants' contention that if the five-year period has elapsed as to one defendant under sections 583.310 and 583.360, the court loses jurisdiction to adjudicate the case against differently-situated defendants. In numerous circumstances, courts have acknowledged dismissal may be required as to some, but not all, defendants.

18

(See *Larkin v. Superior Court* (1916) 171 Cal. 719, 726-727; *Dowling v. Superior Court* (1932) 122 Cal.App. 443, 445-446 (*Dowling*).)

For example, *Brunzell Constr. Co. v. Wagner* (1970) 2 Cal.3d 545 (*Brunzell*), involved multiple defendants. For certain periods of time it was impossible or impracticable for the plaintiff to proceed against one set of defendants. (*Id.* at p. 548.) However, the trial court dismissed the action under then section 583 as to a different set of defendants for whom the five-year period had arguably expired. Our high court considered whether the fact that causes of action against the defendants seeking mandatory dismissal may have been severable from the causes of action involving other defendants, precluded application of the impracticable and futile exception to the five-year dismissal rule.

The *Brunzell* court concluded the availability of severance is not always solely determinative. Instead, each case requires its own analysis to determine if the impossibility or impracticability of proceeding against one defendant within the statutory period rendered it impracticable to proceed against other codefendants, even if severance was legally possible. In some cases, when it is impossible or impracticable to bring one defendant to trial within the five-year period, severing those claims to proceed against other defendants might cause excessive expense, duplication of effort, and create such a burden that the court might find it was impracticable to proceed against defendants in separate suits. (*Brunzell, supra,* 2 Cal.3d at pp. 554-554.) But the court explained its conclusion "in no way undermines the principle that 'a defendant . . . asking [for dismissal under section 583] is entitled to have his right to dismissal determined as to himself alone.' [Citations.] 'Impracticability' may vary not only as to different proceedings but as to different parties within the same proceeding. Each individual is entitled to have his section 583 claim evaluated with respect to his own particular role in the litigation." (*Brunzell, supra,* 2 Cal.3d at p. 555; see also *Lane v. Newport Bldg. Corp.* (1986) 176 Cal.App.3d 870, 874-875 [one defendant in bankruptcy; affirming trial court dismissal of action as against the remaining defendants].)

19

This analysis would make little sense if dismissal as to one defendant mandated dismissal of the action as to all defendants. It would be inaccurate, even unfair, to consider a defendant's particular dismissal argument on its own terms if dismissal of that defendant would also result in dismissal of *all* defendants, even when it was impossible to bring other defendants to trial, or when the other defendants were not even subject to dismissal under section 583.310.

Section 583.310 provides that an action shall be brought to trial within five years after the action is commenced against the *defendant*, singular. (See *Dowling, supra,* 122 Cal.App. at pp. 445-446 [former section 583]; ["The word 'defendant' was manifestly used in the singular to tie the right of dismissal to each defendant filing his answer prior to the five-year period. . . . [The] reasonable construction of the code section is that when any defendant has filed his answer and has not stipulated for an extension of the time of trial he is entitled to a dismissal of the action as to him if the cause is not brought to trial within five years after the filing of his answer."].) Section 583 is not "jurisdictional" in the sense that if the five-year period has expired as to one defendant, the action must be dismissed as to all defendants, regardless of their circumstances. (See *McKenzie v. City of Thousand Oaks* (1973) 36 Cal.App.3d 426, 432 [former section 581a]; *Arnold v. State of California* (1969) 273 Cal.App.2d 575, 585; *Bank of America Assn. v. Superior Ct.* (1936) 15 Cal.App.2d 279, 280.)

**B. Lehman Was Not Subject to Dismissal Under Section 583.310**

In light of the above, we turn to plaintiff's contention that the court should not have dismissed Lehman because the five-year period had not elapsed. We agree, although not based on plaintiff's calculation of the applicable dates.

Plaintiff asserts the five-year period had not expired as to Lehman because it was not added to the action until 2011. This is incorrect. As explained in *Gray v. Firthe* (1987) 194 Cal.App.3d 202 (*Gray*), for purposes of section 583.310, "[a]s to a defendant either expressly named in the original complaint, or named in the original complaint by a fictitious name, the action commences on the date of the filing of the complaint." (*Id.* at p. 209.) When a defendant is added to the action as a "doe" defendant, the five-year

20

period is calculated from the filing of the original complaint. (*Ibid.*; see also *Warren v. Atchison, T. & S. F. Ry. Co.* (1971) 19 Cal.App.3d 24, 37-38.) "But when a new party is added to the action, the action commences as to that party on the date of the order adding him or her as a party or on the date of filing of the pleading naming him or her as a new party." (*Gray,* at p. 209*; Nelson v. A.H. Robbins Co.* (1983) 149 Cal.App.3d 862, 866-867.)

In this case, plaintiff added Lehman to the action as a "doe" defendant. Yet, plaintiff added Lehman as "Doe 31." While the original complaint included fictitiously named defendants identified as Does 1-30, Does 31-50 were not included until the Fourth Amended Complaint, which was filed on January 28, 2008. The five-year period as to Lehman had not expired as of May 2012, when the trial court dismissed the entire action, and would not expire until 2013. The action was not properly dismissed as to Lehman under section 583.310.

### C. The Trial Court Did Not Err in Dismissing the Other Non-Moving Defendants

Unlike Lehman, other non-moving defendants—Roop and the Tornberg defendants—were named in the original complaint. We disagree with plaintiff's contention that the non-moving defendants' failure to file a motion under section 583.310 necessarily precluded a mandatory dismissal. Under section 583.360, subdivision (a), "[a]n action *shall be dismissed by the court on its own motion* or on motion of the defendant, after notice to the parties, if the action is not brought to trial within the time prescribed in this article." (Italics added.) (See *Rio Del Mar Etc. Club v. Superior Court* (1948) 84 Cal.App.2d 214, 220 (*Rio Del Mar*) [under former section 581a requiring service of summons within three years of filing of complaint, "[o]nce the factors necessitating dismissal are brought to the attention of the trial court, it is the duty of the court to dismiss regardless of any participation in the dismissal procedure by either of the parties to the action."]; *Muller v. Coastside County Water Dist.* (1960) 180 Cal.App.2d 712, 713 [accord].)

21

In their appellate briefing, the parties did not consider the court's ability to act on its own motion under section 583.360, subdivision (a), in addressing any alleged court error in dismissing the action as to the non-moving parties. We invited the parties to submit supplement letter briefs on this issue, including whether the court provided sufficient notice under section 583.360, subdivision (a), or whether any defects in notice were waived. In response, plaintiff argued that even if acting on its own motion, the trial court erred because the 2008 stay should have been excluded from the five-year period. Plaintiff further stated the question of sufficient notice would depend on whether the trial court motion could be deemed to have been noticed at the time of the Fidelity defendants' motion, or at the time of the issuance of the tentative ruling. Plaintiff conceded she may have waived any defects in notice by virtue of counsel's arguments at the hearing and in her motion for reconsideration.

There is no dispute that only the Fidelity defendants moved for dismissal under section 583.310.[8] We therefore view the trial court's dismissal of the entire action, as to all parties, as an act on its own motion. (Cf. *Maguire v. Collier* (1975) 49 Cal.App.3d 309, 314 [court erred in dismissing action under mandatory provisions; declining to find court dismissed action on its own motion under discretionary dismissal statute, where nothing in the record suggested it did so].) The trial court had express authority to do so under section 583.360, subdivision (a).

We recognize there are questions relating to notice, such as how much notice the court was required to give, whether it failed to do so, or whether any such error was

---

[8] The Fidelity defendants' motion referred generally to "the action," but specifically requested that the court dismiss the Fidelity defendants from the case. At the hearing on the motion, counsel for the Fidelity defendants argued that even if the court were inclined to exclude 125 days from the five-year period to account for plaintiff's efforts to seek relief from the Lehman bankruptcy stay, that 125-day period should only apply to Lehman. Counsel explained plaintiff should have filed a motion to sever: "Even if it was denied, plaintiff could come here today and say, your Honor, it was impossible, impractical, futile for me to bring the motion, it was denied by the court. . . . . So I would argue that the 125 days does not apply to Fidelity or Rybicki or any of the non-bankrupt defendants at all."

waived. (Compare § 583.360, subd. (a) [court or party may move for dismissal "after notice to the parties"] with § 583.410, subds. (a)-(b) and Cal. Rules of Court, rule 3.1340(a)-(b) [requiring 20 days' notice if court intends to dismiss case on its own motion under discretionary dismissal provisions]; *Eliceche v. Federal Land Bank Assn.* (2002) 103 Cal.App.4th 1349, 1375-1376; *Tew v. Tew* (1958) 160 Cal.App.2d 141, 144.) We do not resolve these questions because we conclude that even if the trial court erred in failing to give proper notice, the error was not prejudicial—and therefore reversible— as to the non-moving defendants besides Lehman.[9] (*In re A.D.* (2011) 196 Cal.App.4th 1319, 1327; *In re Guardianship of Christian G.* (2011) 195 Cal.App.4th 581, 607-608; *Rio Del Mar, supra,* 84 Cal.App.2d at p. 220.)

Plaintiff addressed the dismissal of all defendants at the beginning of the hearing on the Fidelity defendants' motion. But plaintiff never distinguished the defendants named in the original complaint, or Aurora, from the Fidelity defendants.[10] Although plaintiff argued the merits of dismissal against the non-moving defendants at the dismissal hearing, in her motion for reconsideration, and again on appeal, she has never contended the circumstances affecting her ability to bring Aurora, Roop, or the Tornberg defendants to trial were any different than those applicable to the Fidelity defendants. Whereas plaintiff argued Lehman should have merited separate consideration, and supported her arguments with specific facts and legal authorities, she advanced no such arguments regarding the other non-moving defendants, at any time. Thus, plaintiff has provided no basis for us to find that even had she received more notice of the court's

---

[9]     As to Lehman the issue is moot given our conclusions above.

[10]     Aurora was added, not as a doe defendant, but as a new party in the Fourth Amended Complaint. However, plaintiff has not argued the trial court erred in calculating the five-year deadline as to Aurora because it was a later-added defendant. To the extent plaintiff could have contended the trial court should not have dismissed claims against Aurora because the five-year period had not expired, she has forfeited the argument by failing to raise it below, or on appeal. To the extent she raised the argument below, we must consider it abandoned on appeal. (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6.)

intention to act on its own motion under section 583.310 as to Aurora, Roop and the Tornberg defendants, it is reasonably probable a result more favorable to her would have been reached. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800-801; *Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 963.) We see no basis to reverse the order dismissing the action as to any of the defendants named in the original complaint or Aurora. For the reasons described in sections I and II above, we find no error in the trial court's dismissal of the action as to the Tornberg defendants, Roop, or Aurora.

## III.     The Motion for Reconsideration

Plaintiff contends the trial court erred in denying her motion for reconsideration because she presented new circumstances showing the action should not be dismissed as to any defendants except the Fidelity defendants.[11]

Under section 1008, "[a] motion for reconsideration must be based on new or different facts, circumstances or law [citation], and facts of which the party seeking reconsideration was aware at the time of the original ruling are not 'new or different.' [Citation.] In addition, a party must provide a satisfactory explanation for failing to offer the evidence in the first instance. [Citation.]" (*In re Marriage of Herr* (2009) 174 Cal.App.4th 1463, 1468.) "An order denying a motion for reconsideration is interpreted as a determination that the application does not meet the requirements of

---

[11]     We note the court's formal ruling on the motion for reconsideration is not properly before us because the court lacked jurisdiction to hear it. "It is well settled that entry of judgment divests the trial court of authority to rule on a motion for reconsideration." (*Safeco Ins. Co. v. Architectural Facades Unlimited, Inc.* (2005) 134 Cal.App.4th 1477, 1482; *Ramon v. Aerospace Corp.* (1996) 50 Cal.App.4th 1233, 1237 (*Ramon*).) After entering judgment in August 2012, the court had no authority to subsequently rule on the motion for reconsideration. However, since the motion for reconsideration was filed before the entry of judgment, the trial court's entry of judgment was an implied denial of the pending motion. (*Ramon, supra,* 50 Cal.App.4th at p. 1238; *Nave v. Taggart* (1995) 34 Cal.App.4th 1173, 1176-1177.) Plaintiff included the ruling on the motion for reconsideration in her notice of appeal, which was timely filed from the judgment. (Code Civ. Proc., § 1008, subd. (g).) Thus, we review the implied denial of the motion for reconsideration on appeal.

section 1008. If the requirements have been met to the satisfaction of the court but the court is not persuaded the earlier ruling was erroneous, the proper course is to grant reconsideration and to reaffirm the earlier ruling. [Citations.]" (*Corns v. Miller* (1986) 181 Cal.App.3d 195, 202.) We review a trial court's ruling on a motion for reconsideration under the abuse of discretion standard. (*Glade v. Glade* (1995) 38 Cal.App.4th 1441, 1457.)

As to Lehman, our conclusion above renders moot the trial court's denial of the motion for reconsideration. As to the remaining defendants, we find no error in the trial court ruling. In the motion for reconsideration, plaintiff asserted the trial court had not considered evidence before it regarding the 2008 stay. Plaintiff also contended she was unable to produce evidence "as to whether" she was reasonably diligent in prosecuting the action against the non-moving defendants because she had "no reason to anticipate the Court would consider dismissing the action as to all defendants." She did not identify or describe this evidence, except with respect to Lehman. Plaintiff also argued the non-moving defendants waived their right to move for dismissal.

These arguments did not present different facts, circumstances, or law. Indeed, at the original hearing on the dismissal motion, plaintiff's counsel argued the non-moving defendants waived their right to move for dismissal, and extensively argued the trial court should exclude the 2008 stay from the five-year period. (*Gilberd v. AC Transit* (1995) 32 Cal.App.4th 1494, 1500 [motion for reconsideration failed where proponent presented no facts or authorities that were not considered by the trial court in its initial orders].) Moreover, at the time of the hearing, plaintiff was aware of the possibility that the court might dismiss the action as to all defendants. Indeed, plaintiff's counsel opened his remarks at the hearing with the argument that the court should not dismiss the action as to the non-moving defendants because they had waived their right to seek dismissal. The facts and circumstances raised in plaintiff's motion were known to her before the court made its dismissal order. (*Corns v. Miller, supra,* 181 Cal.App.3d at p. 202.) The trial court's denial of the motion for reconsideration was not an abuse of discretion.

## DISPOSITION

The judgment dismissing the action as to Lehman is reversed. In all other respects the judgment is affirmed. Each party to bear its own costs on appeal.

**CERTIFIED FOR PUBLICATION**


BIGELOW, P. J.

I concur:


GRIMES, J.

26

**FANNIE MARIE GAINES v FIDELITY NATIONAL
TITLE INSURANCE COMPANY et al– B244961**

RUBIN, J. - Concurring and Dissenting

I concur in the majority's reversal of the dismissal of appellant's action against Lehman Brothers Holdings, Inc. (Lehman Brothers). I write separately to record my disagreement with the majority's affirmance of the dismissal as to the other defendants. In my view, the trial court abused its discretion in that the twists and turns of this case made appellant's ability to bring the case to trial within five years of filing the complaint "impossible, impracticable, or futile." (Code Civ. Proc., § 583.340, subd. (c).)[1]

*Abuse of Discretion*

Before I consider the ruling of the trial court in this case, I discuss the abuse of discretion standard.

As appellate judges we are taught to consider each case in the context of the applicable standard of review which, for the most part, is one or more of substantial evidence, abuse of discretion, and de novo review. Many appellate decisions and some commentators have criticized the abuse of discretion standard as the most misused and most misunderstood of these. Our colleague in Division 6, Justice Gilbert, has said that the "abuse of discretion standard is itself much abused." (*Ziesmer v. Superior Court* (2003) 107 Cal.App.4th 360, 363.) It is indeed.

The most common test for determining whether discretion has been abused is to ask whether the trial court's ruling was "arbitrary, capricious or whimsical." A brief review of appellate cases reveals that this standard has been applied countless times in just the last 30 years. Another formulation is "whether [the trial court's ruling] exceeds the bounds of

---

[1]     I agree with the majority that the stay issued in this case was a partial stay under *Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724, 731 (*Bruns*). Thus appellants are not entitled to relief under the "stay" exception to the five-year rule. (Code Civ. Proc., § 583.40, subd. (b).)

reason" (*People v. Jackson* (2005) 128 Cal.App.4th 1009, 1018), and still another, is whether the ruling is "patently absurd . . . resulting in a manifest miscarriage of justice." (*Baltayan v. Estate of Getemyan* (2001) 90 Cal.App.4th 1427, 1434; see also *Blank v. Kirwan* (1985) 39 Cal.3d 311, 331 ["miscarriage of justice"].)

Our Supreme Court recently used the following description of the standard: "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773, citing *People v. Carmony* (2004) 33 Cal.4th 367, 377.) Returning to the whimsy characterization, the Supreme Court also has relied on Witkin's description. " 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.' " (*Sargon at p. 773*, citing 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 364, p. 420.) Several of these articulations are collected in Justice Richman's thoughtful opinion in *People v. Jacobs* (2007) 156 Cal.App.4th 728, 736.**[2]**

It is apparent that appellate courts formulate abuse of discretion in many ways but it equally appears that each characterization is lacking for at least two reasons. First of all, none of these formulations is particularly helpful to the appellate courts. As Justice Weiner wrote in a case involving discretionary dismissals for failure to bring a case to trial within two years: "[Abuse of discretion] is a standard, however, which is so amorphous as to mean everything and nothing at the same time and be virtually useless as

---

**[2]**    In *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297-1298, the Third District expressly rejected the "whimsical, arbitrary or capricious test," concluding instead that discretion must be considered in light of the purposes and policies of the relevant statute. " 'This pejorative boilerplate' [] is misleading since it implies that in every case in which a trial court is reversed for an abuse of discretion its action was utterly irrational. Although irrationality is beyond the legal pale it does not mark the legal boundaries which fence in discretion." (See also *Department of Parks & Recreation v. State Personnel Board* (1991) 233 Cal.App.3d 813, 831, fn. 3 ["Although an act exceeding the bounds of reason manifestly constitutes an abuse of discretion, abuse is not limited to such an extreme case."].)

an analytic tool." (*Hurtado v. Statewide Home Loan Co.* (1985) 167 Cal.App.3d 1019, 1022 (*Hurtado*), disapproved on other grounds in *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479, fn. 4.) To put Justice Weiner's observations in the form of a question: "How should the appellate courts go about trying to decide whether a trial court decision is, for example, whimsical?"

Aside from the absence of an analytical tool, the various formulations of abuse of discretion also have serious ramifications for the relationship between the appellate and trial courts. The colorful "whimsical, capricious, arbitrary" standard proves the point. I am doubtful that any judge in our state has made a ruling out of whimsy or caprice. Whim, for example, is "a capricious or eccentric and often sudden idea or turn of the mind." (*Merriam-Webster*, Electronic Edition [2013, http://www.merriam-webster.com/dictionary/whim] [as of December 5, 2013].) This does not describe judicial decision making. If we are truly engaging in appellate review to weed out the whimsical or capricious decision, I doubt we would ever find abuse of discretion. Labeling a trial judge arbitrary is so pejorative, appellate judges would almost always be adverse to finding abuse of discretion under that standard. Describing a trial court decision "as an act exceeding all bounds of reason" or "patently absurd" is also inherently inflammatory.[3]

---

[3]     *People v. Jacobs, supra,* 156 Cal.App.4th 728, provides a good example of a case where the appellate court found that the trial court ruling was not arbitrary, whimsical or capricious but nevertheless constituted an abuse of discretion. There, the issue was whether the defendant was entitled to be sentenced by the judge who presided over his jury trial. The court first held that the *Arbuckle* rule under which a defendant who enters into a plea bargain is entitled to have the same trial judge impose sentence did not apply to the defendant following a jury trial. (*People v. Arbuckle* (1978) 22 Cal.3d 749, 756; *Jacobs* at p. 733.) The Court of Appeal then concluded that Judge No. 2 nevertheless abused his discretion in not continuing the sentencing hearing three days to allow Judge No. 1 to pronounce sentence. The Court of Appeal considered the issue first under the arbitrary, whimsical, capricious test, and found no abuse of discretion under that standard. Judge No. 2 was well informed of the factors to be considered in his decision, heard arguments and expressed concern that delays in sentencing could contribute to additional jail overcrowding. "In sum, we cannot conclude that [Judge No. 2] was

3

Even the word "abuse" in the "abuse of discretion standard" is incendiary, as courts often link "abuse" to "elder" or "child" in describing heinous behavior. Would we not be loathe to describe a judge as *abusing* his or her power?[4] Because of these various distasteful formulations, one commentator colorfully described a reversal for abuse of discretion as "the noise made by an appellate court while delivering a figurative blow to the trial judge's solar plexus. It is a way of saying to the trial judge, 'This one's on you.' The term has no meaning or idea content that I have ever been able to discern. It is just a way of recording the delivery of a punch to the judicial midriff." (Maurice Rosenberg, Professor of Law, Columbia University, address to Federal Appellate Judges Sem. (May 13-16, 1975) Appellate Review of Trial Court Discretion.)

As intermediate appellate courts, we are bound to follow California Supreme Court precedent in this area, as in all others. And as the authorities cited above reveal, the various articulations of abuse of discretion are all binding on us. How do we apply any or all of them in a way that is jurisprudentially sound? Justice Weiner has provided some helpful guidance:

"Focusing instead on the concept of 'discretion,' that term in one sense refers generally to the power to decide. But every court – both trial and appellate – has 'discretion' in that sense. Whether the source of the power to decide is constitutional or statutory, the essence of the judicial function is decisionmaking. 'Discretion' in the sense of the 'abuse of discretion' standard refers instead to the relationship between the trial and appellate decisionmaking processes and, more particularly, to the amount of

---

arbitrary. Or whimsical. And he was certainly not capricious." (*Jacobs* at p. 736.) The court nevertheless found an abuse of discretion, focusing instead on "the legal principles governing the subject of its action" (*Westside Community for Independent Living, Inc. v. Obledo* (1983) 33 Cal.3d 348, 355) and the reasonableness of the decision being appealed. (*Jacobs* at p. 740.)

[4]     I am aware of at least one instance in which this division issued an alternative writ suggesting the trial court had abused its discretion. The trial judge, apparently equating abuse with actual bias, promptly recused himself.

deference which appellate courts accord to trial court determinations.  Discretion in this sense – that is, trial court discretion – is not a sacrosanct concept.  Harsh as it may sound, the nature of the relationship between superior and inferior courts dictates that trial courts have discretion only to the extent appellate courts perceive a reason to defer.  The breadth of trial court discretion is a function of the degree to which appellate courts exercise deference." (*Hurtado, supra,* 167 Cal.App.3d at p. 1022.)

Justice Weiner's deference continuum is helpful as an analytical tool because it is based on the accepted truth that in many situations trial courts are better suited than appellate courts to be the ultimate decision maker.  He points to two areas where the greatest deference to the trial court is warranted.  First, when factual determinations are involved.[5]  Second, when the judge's position in the courtroom gives him or her a superior opportunity to get "the feel of the case." (*Hurtado, supra,* 167 Cal.App.3d at p. 1022, quoting *Noonan v. Cunard Steamship Co.* (2d Cir. 1967) 375 F.2d 69, 71.)  Examples of the latter "include a host of trial and pretrial administrative rulings such as those pertaining to continuances, pretrial conferences, many discovery matters, the conduct of counsel, cumulativeness of evidence, the extent of voir dire and the length of the trial day." (*Hurtado,* at p. 1022.)

---

[5]     Appellate courts typically employ the substantial evidence test, not abuse of discretion, in reviewing factual determinations, but even those two standards often overlap.  "We hold that because there was *substantial evidence* supporting the trial court's findings that common issues did not predominate and that plaintiff's claims were not typical of the putative class members' claims, the trial court did not *abuse its discretion* in denying the class certification motion." (*Lopez v. Brown* (2013) 217 Cal.App.4th 1114, 1118; italics added.)  Even the Legislature has conflated the two standards in its administrative writ statute:  "*Abuse of discretion* is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the *findings are not supported by the evidence*." (Code Civ. Proc., § 1094.5; italics added; see *Department of Finance v. Commission on State Mandates* (2013) 220 Cal.App.4th 740, 763.)

In applying the abuse of discretion standard in its various formulations cited earlier, I do so through the analytic framework suggested by Justice Weiner's deference continuum, and mindful of Justice Richman's conclusion that discretion must be exercised "in conformity with the spirit of the law" and not "defeat the ends of substantial justice." (*People v. Jacobs, supra,* 156 Cal.App.4th at p. 740.)

Here the facts underlying the grant of respondents' motion to dismiss for lack of prosecution do not appear to be in dispute. The majority opinion cites the procedural aspects of the case from the filing of the complaint to dismissal without suggesting any controversy as to those facts. Thus as to Justice Weiner's first point, we need not give any particular deference to the trial court as fact finder. As to the second factor – the trial court being in the best position to get a feel for the case – some deference is due. The examples given in *Hurtado, supra,* 167 Cal.App.3d at page 1022 – continuances, pretrial conferences, many discovery matters, the conduct of counsel, cumulativeness of evidence, the extent of voir dire and the length of the trial day – were surely not intended to be exhaustive. But each of them is concerned with the management of the trial, an area where appellate courts should give the greatest deference to the trial courts. While the issue before us is indeed procedural like many of the examples listed above, it has very little to do with the management of the trial, except in the ultimate sense that if a case is dismissed the trial court has managed the trial to its termination. The ruling which the trial court made deserves some deference. But at bottom, the issue presented is: on uncontested facts was it impossible, impracticable, or futile to get this case to trial within five years. Using the deference continuum, I suggest that a trial court is not in a significantly better position to decide this issue than an appellate court. Nevertheless, in determining whether there has been an abuse of discretion, I apply the standard as expressed by our Supreme Court, keeping in mind however that we deal with largely undisputed facts.[6]

---

[6]  In *Bruns,* our Supreme Court stated that under the abuse of discretion standard, the question of impossibility, impracticability, or futility is best resolved by the trial court,

*"Impossible, Impracticable, or Futile"*

The statutory provision we are required to interpret consists of three words.  Of the three, dictionary definitions seem to rule out "impossible" and "futile."[7]  The primary definition of "impracticable" is "difficult to do or use."  (*Merriam-Webster*, Electronic Edition [2013, http://www.merriam-webster.com/dictionary/impracticable] [as of December 5, 2013].)  In *Bruns, supra,* 51 Cal.4th at page 731, the Supreme Court stated that impracticability (like futility) involves a determination of " ' "excessive and unreasonable difficulty or expense' " in light of all the circumstances of the particular case."  With that test in mind, I turn to the procedural facts leading up to the dismissal.

The complaint was filed in November 2006 and asserted various tort and statutory claims.  It alleged that in February of that year, Milton and Fannie Marie Gaines had over $500,000 in equity in their home but had fallen two months behind in their mortgage

---

which "is in the most advantageous position to evaluate these diverse factual matters in the first instance."  (*Bruns, supra,* 51 Cal.4th at p. 731.)  I note that the factual circumstances surrounding the delay were not set out by the *Bruns* court because the record was quite lengthy – more than 1,000 pages of documents and 300 exhibits.  (*Id.* at p. 722, fn. 3.)  Because the Court of Appeal had not reached the issue of whether the circumstances justified a finding of impossibility, impracticability, or futility, the *Bruns* court remanded the matter to the Court of Appeal with directions to determine whether the trial court had abused its discretion in not excluding the time period of the partial stay in calculating the statutory five years.  (*Id.* at pp. 731-732.)

Given the voluminous record on that issue in *Bruns*, I assume the factual circumstances were numerous and in many cases disputed.  Here we consider a far more circumscribed record that contains certain key undisputed facts.

[7]    One definition of "impossible" is "unable to be done or happen."  (*Merriam-Webster*, Electronic Edition [2013, http://www.merriam-webster.com/dictionary/impossible] [as of December 5, 2013].)  Futile is defined as "having no result or effect; pointless or useless."  (*Ibid.*)  The facts of this case do not lend themselves to a finding that bringing the case to trial within five years was impossible or futile.

A secondary definition of impracticable is "impossible" but I exclude that from discussion because "impossible" is an alternative basis for extending the five year rule under Code of Civil Procedure, section 583.340, subd. (c), so "impracticable" must mean something else.

7

payments to Countrywide Home Loans, Inc. (Countrywide). In June or July of 2006, at the suggestion of a Countrywide employee, the Gaineses contacted the Tornberg defendants, who offered to help refinance the loan. By August, the property had been sold to Tornberg under circumstances that the Gaineses believed would allow them to lease back the property and have an option to repurchase. Tornberg, without their permission, recorded an altered deed. The escrow/title insurance defendants improperly paid Tornberg $90,000 from escrow, and Tornberg obtained an additional $150,000 in cash through a refinance. By the following year Tornberg was $25,000 - $30,000 behind the mortgage payments, and the Gaineses paid that amount to avoid foreclosure. It could be inferred that Tornberg, having made $240,000, was going to walk away, with the Gaineses left to lose their home. The complaint was filed against the Tornberg defendants, the escrow company, as well as Countrywide Home Loans, the holder of the original note. After multiple transfers between various entities, the Tornberg loan was eventually held or serviced by Aurora Loan Services LLC (Aurora) and Lehman Brothers, parties who were later brought into the action.

After the filing of the complaint, this case proceeded on a pot-hole riddled road which made the bringing of the case to trial not impossible but impracticable. Because the availability of section 583.340 relief depends on whether the plaintiff has exercised "reasonable diligence" (*Bruns, supra,* 51 Cal.4th at p. 731), I start with some of the key events and obstacles presented in this case.

- First, an additional word about the pleadings. The complaint was amended four times during the first 14 months of the litigation. As is common in many of these "financial meltdown" cases, promissory notes are separated from deeds of trusts, paperwork is often not complete, and the parade of people and entities appears endless. Apparently the entire process started with an unsolicited phone call from a Countrywide employee who told the Gaineses that Countrywide had approved them for a refinance loan. This was false. Later, the employee suggested that the Gaineses contact her fiancé Tornberg, who eventually bought the property.

8

- Other defendants named in amended complaints included Greenpoint Mortgage Funding, Inc., United Mortgage Loan & Investment, LLC and UM Acquisitions, LLC. Defendants Countrywide, United Mortgage Loan & Investment, LLC and UM Acquisitions, LLC, settled with plaintiffs, and Greenpoint Mortgage Funding, Inc., appears to have been dismissed. In January 2008, plaintiffs added Aurora, which admitted in its January 2009 answer that it held an $865,000 interest in the property. In November 2009, Aurora asserted in a motion to amend its answer that it had mistakenly asserted an ownership interest in its original answer when in fact Lehman Brothers was the owner of the loan encumbering the property. Lehman Brothers had filed for bankruptcy in 2008 and as events unfolded would become one of the largest casualties of the financial crisis. It was not until sometime after December 2010 that Aurora provided any proof to plaintiffs or the court that Lehman Brothers had succeeded to its interest. (Apparently the note at one time was held by MERS – Mortgage Electronic Registration Systems, Inc.)[8] This came in the form of an "Assignment of Deed of Trust and Request for Special Notice" which indicated that Lehman Brothers had been assigned Aurora's interest. Because of the pending bankruptcy and the need to obtain relief from the litigation stay against Lehman Brothers, the latter was not named in an amended complaint until November 2011.

- On March 31, 2008, before Aurora notified plaintiffs that it had no interest in the property, the parties agreed to a 120-day partial stay of the litigation – partial because certain outstanding discovery requests could be answered. The intent of the stay was to allow the parties to mediate their dispute. The

---

[8]  MERS was a frequent player in financial meltdown foreclosures. Its basic structure and role was to act as nominee in a process by which successive transfers in notes were accomplished without recordation in public records. The process is described by the court in *Fontenot v. Wells Fargo Bank, N.A.* (2011) 198 Cal.App.4th 256, 267.

settlement discussions were unsuccessful, and on November 28, 2008, the trial court vacated the stay.

- On November 29, 2009, Fannie Marie Gaines passed away. (Her husband, Milton Gaines, had died in August 2006, shortly after the Gaineses had agreed to sell the Property to the Tornberg defendants and about 10 weeks before the action was filed.) On January 28, 2010, Gaines's son was substituted in as a party plaintiff, an amended complaint was filed, and defendants were given 30 days to file answers.

- The court expressed concern that the delays in bringing Lehman Brothers into the action were becoming excessive. According to Aurora, Lehman Brothers owned the $865,000 loan and deed of trust, and obviously was the subject of the lion's share of plaintiffs' claims. At an August 20, 2010 status conference, counsel for plaintiffs suggested that the solution to the Lehman Brothers situation would be to bifurcate the trial and proceed first against all the non-Lehman Brothers defendants. The court replied, "don't hold your breath on that," in apparent reference to the unlikelihood the court would agree to bifurcation. The trial court further explained: "So the point of it is, I'm not going to look with a great deal of favor on bifurcating things." The court did make clear that its comments should not be taken as suggesting it definitely would refuse to bifurcate. Some of the delays associated with Lehman Brothers were caused by Aurora's inability to provide any proof that it had transferred its interest to Lehman Brothers. Without such evidence plaintiffs' ability to go after Lehman Brothers would be significantly compromised. As indicated above, proof in the form of the assignment came in December 2010. Further delays in proceeding against Lehman Brothers were caused by financial difficulties plaintiffs apparently encountered in retaining counsel in New York where the bankruptcy proceedings were pending. In June 2011, New York counsel

10

commenced work on the motion to vacate the bankruptcy stay, and the stay was lifted in October 2011.

These facts show that the litigation course of this controversy went sideways rather than forward for much of the time, often through no fault of plaintiffs or anyone else for that matter. In contrast to many cases in which the trial court found no excuse for a delay beyond five years, this case was also extensively litigated; the parties did not sit on their hands. (Compare *Mitchell v. Frank R. Howard Memorial Hospital* (1992) 6 Cal.App.4th 1396, 1404-1406 [dismissal of action under five-year rule affirmed when plaintiff filed both federal and state actions and did nothing in the state lawsuit for four years; plaintiff "had long ago abandoned" the state court action; plaintiff's conduct was dilatory and the court would not reward "unreasonable procrastination"]; *Ferk v. County of Lake* (1988) 205 Cal.App.3d 268, 278 [action "came to a standstill" when plaintiffs substituted themselves in pro per].)

Turning to the statutory test, there were two stays and two other events that significantly interfered with plaintiffs' ability to get to trial. The first stay arose from the Lehman Brothers' bankruptcy, which the trial court correctly excluded from the five-year calculation. The second stay was the partial stay the parties had agreed to in order to attempt settlement. That stay was either 120 days (the time the parties had agreed to stay) or 217 days (the amount of time before the trial court actually lifted the stay). As a partial stay, under *Bruns, supra,* 51 Cal.4th at pages 724, 731, the stay did not entitle plaintiffs to the automatic exclusion under section 534.40, subdivision (b). But as *Bruns* itself makes clear, a partial stay is a factor to be considered under the subdivision (b) impracticability test. The trial court did not exclude any time for the partial stay even though it had the discretion to do so.

The two events were: (1) the death of Fannie Marie Gaines and the necessity to substitute her son as a party plaintiff; and (2) Aurora's mistaken admission in its January 2009 answer that it had the right to assert an ownership interest in the Gaineses' property, which was not corrected by Aurora until nearly 11 months later. It would be another nine months after that until Aurora supplied documentary proof of its claim. The trial court

11

excluded an additional 60 days from the five years due to the death of Fanny Gaines and another 125 days because of the Lehman Brothers stay. But it did not exclude any of the Aurora/Lehman Brothers' or partial-stay time. Under the court's calculation, the case was 82 days beyond the five year limitation.

If the trial court had exercised its discretion to exclude the 120 days of the parties' stipulated stay or the 217 days of actual stay or any significant part of the Aurora/Lehman Brothers time, the five years would not have elapsed. Significantly the trial court found that the partial stay did not make it impossible, impracticable or futile to bring the case timely to trial because it did not affect "previously served and outstanding written discovery." The minute order did not describe whether in fact there was any discovery completed in the interim or how the completion of discovery during the time of the stay would have contributed in any meaningful way to the progress of the case. This was not a partial stay against less than all parties which would enable a plaintiff to engage in all pretrial and discovery work against other parties during the "stay." Stated differently, this may have been a partial stay under *Bruns* but it was barely so.

Furthermore, the trial court made no allowance for the unilateral mistake of Aurora in asserting an ownership interest in the property, which consumed approximately 11 months of the 5 year period. Whatever delays were incurred as a result should not be chargeable to appellants. At a minimum, I believe it was error not to exclude some or all of that wasted chunk of time. Presumably if Aurora had not made its error and instead promptly identified Lehman Brothers, the bankruptcy stay would have been lifted 11 months earlier, well within the 5 year period. Adding further to the delay, Aurora did not provide proof of Lehman's ownership for another 9 months.

Four different trial judges spent considerable time on this case. The complaint was filed on November 13, 2006. The first trial judge initially heard the case on February 20, 2007. The case was transferred to the second judge in approximately April of 2007. The next reassignment was on July 16, 2008. That judge had the case for four years until April 24, 2012 (well beyond the five year anniversary of the filing of the

12

complaint).  The judge who dismissed the action received the case on May 2, 2012, and dismissed the case on August 24, 2012.[9]

The foregoing discussion demonstrates that plaintiffs prosecuted this case with reasonable diligence.  It was a very serious matter, with very experienced and talented trial counsel.  I now turn to whether the trial court's exercise of discretion not to exclude the additional time and allow the case to proceed to trial constituted a "miscarriage of justice." (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 331.)  Or, conversely, as Justice Richman has said, was discretion exercised "in conformity with the spirit of the law" and not to "defeat the ends of substantial justice." (*People v. Jacobs, supra,* 156 Cal.App.4th at p. 740.)

This case was one of hundreds, perhaps thousands of lawsuits that grew out of the financial meltdown.  This litigation is almost the paradigm case:  elderly plaintiffs – home owners with substantial equity in their house, mortgage payments two months in arrears – are approached by an employee of their lender with an unsolicited offer to refinance the mortgage based on the lender's so-called, but false, "preapproval."  This is followed by a bait and switch that sends plaintiffs to the employee's fiancé, who offers to help with a refinance.  The fiancé ends up buying the house with a supposed offer to include lease-back and repurchase options which fail to materialize in the final documentation.  In comes the line of assignees and transferees, including ultimate note holder Lehman Brothers, which will not survive the financial crisis.  Meanwhile the "assister" pulls out $90,000 in cash from the deal without plaintiffs' approval but with the aid of the escrow/title insurance company.  Later he refinances the property and obtains another $150,000, for a tidy $240,000 fee for his "assistance."  Remarkably, the loan goes into default because the assister does not pay "his" mortgage, and plaintiffs pay an additional $25,000 to $30,000 to avoid foreclosure.  Shortly before the lawsuit is filed, one of the plaintiffs dies.  During its pendency, the other dies.

---

[9]     The various reassignment and other dates cited in the text come from the Los Angeles Superior Court Case Summary, BC361768.

I acknowledge that some of these "facts" are allegations to be decided after trial. We do know that plaintiffs settled with Countrywide for $375,000, of which $200,000 represented lost equity, with the rest designated for noneconomic damages. This suggests that there was some fundamental merit to at least some of plaintiffs' claims, that this was not a sham lawsuit, and this was a lawsuit that demanded the trial court's exercise of discretion under section 583.340, subdivision (b) to avoid a miscarriage of justice. In my view the dismissal of this lawsuit under the circumstances described defeats the substantial ends of justice. Instead, it rewards parties who, it would appear, have played a major and unlawful role in the theft of someone's home.

I would reverse the trial court's judgment in its entirety.



RUBIN, J.

14